UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

RICHARD MILLER,

                    Petitioner,                    10 Civ. 7120

        -against-                                  OPINION

WILLIAM E. PHILLIP, Superintendent,
Greenhaven Correctional Facility,

                    Respondent.

------------------------------------X

A P P E A R A N C E S:

            Attorney for Petitioner

            CENTER FOR APPELLATE LITIGATION
            74 Trinity Place, 11th Floor
            New York, NY  10006
            By:  Robert S. Dean, Esq.
                 Barbara Zolot, Esq.

            Attorney for Respondent

            NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
            1 Hogan Place
            New York, NY  10013
            By:  Patrice J. Curran, Esq.

**Sweet, D.J.**

Petitioner Richard Miller ("Miller" or the "Petitioner,") has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, which has been opposed by respondent William E. Phillip, Superintendent (the "Respondent" or the "State").  Based on the conclusions set forth below, the court finds that Miller's counsel was not ineffective, and the petition is denied.

## Prior Proceedings

By New York County Indictment Number 1969/00, filed on March 24, 2000, Petitioner was charged with first-degree murder (in the course of a robbery), two counts of second-degree murder (intentional and felony murder), first-degree robbery (armed), attempted first-degree robbery (armed), and second and third-degree weapons possession.  The charges arose in connection with an incident in the late morning of March 8, 2000.  At that time, Lakisha Ridley ("Ridley") accompanied Mark Pressley ("Pressley") to 154th Street in Manhattan to buy drugs.  After Pressley completed his purchase in a nearby building, the couple returned to Pressley's parked car.  As Pressley entered the car, a man

1

later identified as the Petitioner, approached, put a gun to
Pressley's neck, and demanded that he turn over the drugs and
his jewelry.  The man also reached behind Pressley, pointed the
gun at Ridley, and told her to give him the "fucking drugs" or
he would "blow her head off."  After Pressley handed Petitioner
his ring, bracelet, and necklace, Pressley was shot in the neck
and the man fled.  Ridley left the car, called for help, and
convinced a passerby to call 911.  A short time later, the
police and an ambulance arrived.  Pressley was taken to the
hospital but died soon after.  On March 12, 2000, after a police
investigation, Petitioner was arrested at the 30th Precinct.
Ridley identified Petitioner in a lineup as the man who had shot
Pressley.  Petitioner denied that he had shot Pressley and
claimed that he had been home at the time of the shooting.

Petitioner moved to suppress his statements and the
lineup identification.  On November 27, 2000, a combined
Huntley/Wage hearing was held before Justice Edward McLaughlin
and a jury.

During the trial, including during the final charge,
Justice McLaughlin instructed the jury that the elements of the
crime with which Petitioner had been charged had to be proved

beyond a reasonable doubt.  During the final charge, in the course of explaining the jury's role as fact-finder, the court also advised the jury that "where two factual inferences may be drawn of equal weight," one "consistent with guilt," and one "consistent with innocence," the Petitioner was "entitled to the factual inference of innocence" ("the two-inference instruction").

During deliberations, the jury sent out a note evincing confusion about the relationship between the reasonable doubt standard and the standard used to weigh inferences from facts.  The court repeated the two-inference instruction as part of a supplemental charge.  In response to the same jury note, the court explained that, in contrast to the reasonable doubt standard which applied to the elements of the crime, for "a fact to exist," the standard of proof was "50.1, more likely than not" ("the fact-finding preponderance instruction").  Lastly, in the course of advising the jurors on how to reach a unanimous verdict during the final charge, the court pointed out that in civilian, as opposed to military life, the "two most important things are voting and jury service," and that in terms of voting, "50.1 beats 49.9 every time."

3

On February 14, 2001, Petitioner was convicted as charged.  On April 20, 2001, Petitioner was sentenced to an aggregate term of from 32½ years to life.

In papers dated May 3, 2002, Petitioner filed a pro se motion pursuant to New York Criminal Procedure Law ("CPL") Section 440.10 asking that the trial court set aside the judgment against him, or in the alternative grant him a hearing. Petitioner argued that his lawyer had been ineffective for failing to both "investigate" one of the detectives who had worked on his case or obtain police reports generated by that detective that purportedly contained "exculpatory" information. After the trial court denied that motion, Petitioner filed an application pursuant to CPL 460.15 requesting that the Appellate Division, First Department ("the Appellate Division"), grant him leave to appeal that decision.  On or about January 9, 2003, the Appellate Division granted that request.

On direct appeal in the Appellate Division, Petitioner raised nine separate claims, in which he complained, inter alia, that the fact-finding preponderance supplemental instruction was erroneous, and that his post-conviction motion had been improperly denied.  On June 24, 2004, the Appellate Division

4

unanimously affirmed the judgment of conviction.  People v. Miller, 8 A.D.3d 176 (N.Y. App. Div. 2004), appeal granted 825 N.E.2d 141 (N.Y. 2005).  The decision addressed several of the substantive issues that had been raised by Petitioner, but with regard to the remaining claims, including the complaint about the supplemental instruction, the Appellate Division found that "[Petitioner's] remaining contentions are unpreserved," and declined to exercise its power to review them in the interest of justice.  However, the court noted that if it were to review those claims, it "would reject" them.  Further, the Appellate Division held that the trial court had properly denied Petitioner's post-judgment motion without a hearing because examination of the direct record revealed that Petitioner had received effective assistance from his trial counsel and that his assertions to the contrary were unsupported.

On July 14, 2004, Petitioner filed an application for leave to appeal the decision handed down by the Appellate Division to the New York Court of Appeals ("Court of Appeals"). On January 5, 2005, that application was granted.  On appeal to the Court of Appeals, Petitioner advanced four claims.  As pertinent here, Petitioner again argued that the trial court erred when it gave the above-described supplemental instruction.

Petitioner also claimed that his conviction on two counts of second-degree murder should be dismissed as inclusory counts of his conviction for first-degree murder.  The Court of Appeals modified the judgment only insofar as it accepted this latter claim and vacated the two second-degree murder counts as inclusory concurrent counts of first-degree murder.  The Court of Appeals unanimously rejected the rest of Petitioner's claims. In so doing, the Court of Appeals found that Petitioner's complaint regarding the supplemental charge was unpreserved and that his remaining claims lacked merit.  People v. Miller, 6 N.Y.3d 295, 301-303 (N.Y. 2006).

     The New York Court of Appeals remanded the case so that the trial court could resentence Petitioner on the first-degree murder count.  On April 7, 2006, Petitioner was resentenced to an aggregate prison term of 32 ½ years to life. Petitioner appealed his newly-imposed sentence.  In a decision dated March 6, 2007, the Appellate Division rejected Petitioner's claim and affirmed his conviction.  People v. Miller, 38 A.D.3d 233 (N.Y. App. Div. 2007).  Petitioner sought leave to appeal the Appellate Division's finding to the New York Court of Appeals, but in an order dated June 5, 2007, that court

denied Petitioner's application.  People v. Miller, 872 N.E.2d 887 (N.Y. 2007).

Subsequently, in a second CPL 440.10 motion dated July 24, 2007, Petitioner again contended that his trial lawyer was ineffective.  This time, Petitioner complained that his representation was deficient because his attorney failed to object to the fact-finding preponderance supplemental instruction that he had previously challenged on direct appeal, thus rendering that claim unpreserved for review.  Petitioner also asserted that his trial attorney failed to object to the two-inference charge in the main charge and went so far as to affirmatively "solicit" it from the court in the supplemental charge.  Finally, Petitioner requested that his conviction be reversed based on his claim that as a result of his attorney's omissions in this regard, as well as his failure to object to the election language, the trial court had provided the jurors with a series of instructions that when combined with the election language, lowered the burden of proof required to convict Petitioner to an "unconstitutional extent."

In a decision dated March 3, 2008, Justice McLaughlin found that the representation provided by Petitioner's trial

7

counsel had met constitutional requirements and denied
Petitioner's second post-conviction motion.  Petitioner filed a
motion to appeal that decision to the Appellate Division, and on
September 29, 2008, that application was granted.

On this second appeal to the Appellate Division,
Petitioner renewed his arguments that the court's charges at
issue were erroneous, and that trial counsel was ineffective
because of his failure to object.  The Appellate Division
affirmed the trial court's denial of Petitioner's post-judgment
motion.  Petitioner applied for leave to appeal the Appellate
Division's decision, but by an order dated September 28, 2009,
the New York Court of Appeals denied that application.  People
v. Miller, 916 N.E.2d 442 (N.Y. 2009).

On September 16, 2010, Petitioner filed his petition
for a writ of habeas corpus on the ground that his trial counsel
provided ineffective representation in violation of his Sixth
Amendment right to counsel, contending that his trial attorney
was ineffective because counsel failed to object to the two-
inference language in the main and supplemental charges,
improperly solicited the two-inference charge in the
supplemental instruction, and failed to protest the fact-finding

8

preponderance language contained in that same supplemental

charge.  The Petitioner has asserted that when combined with the

election language contained in the main charge, the

instructions, as a whole lowered the burden of proving his guilt

to an "unconstitutional extent."  The State filed its response

to the petition, the Petitioner replied, and that petition was

marked fully submitted on February 8, 2011.


**The Standard of Review**


Under the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), a petitioner can obtain habeas corpus

relief only by showing that the state court's denial of his

claims were either "contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined

by the Supreme Court of the United States,"  28 U.S.C. §

2254(d)(1), or that the state-court decision "was based on an

unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." 28 U.S.C. §

2254(d)(2).


The relevant Supreme Court precedent is Strickland v.

Washington, 466 U.S. 668 (1984), which articulated the standard

9

for establishing a claim of ineffective assistance of counsel.
Under Strickland, Petitioner must show that counsel's
performance fell below reasonable standards of competence, i.e.,
that the attorney "made errors so serious that counsel was not
functioning as the 'counsel' guaranteed the defendant by the
Sixth Amendment." Strickland, 466 U.S. at 687. That
demonstration must be sufficiently powerful to defeat the strong
presumption that counsel's conduct fell "within the wide range
of reasonable professional assistance" appropriate under the
circumstances of the case. Id. at 689; see also Mills v.
Scully, 826 F.2d 1192, 1197 (2d Cir. 1987) ("In assessing
counsel's performance, a defendant must overcome a strong
presumption that counsel's conduct might be considered sound
trial strategy.").

     The object of review in this context "is not to grade
counsel's performance," but rather "to ensure that a defendant
has the assistance necessary to justify reliance on the outcome
of the proceeding." Strickland, 466 U.S. at 691-92. The
Supreme Court cautioned in Strickland that:

> It is all too tempting for a defendant to second-guess
> counsel's assistance after conviction or adverse
> sentence, and it is all too easy for a court,
> examining counsel's defense after it has proved

10

unsuccessful, to conclude that a particular act or
omission of counsel was unreasonable.

Id. at 689 (citation ommitted).  For this reason, the Supreme
Court held that "[j]udicial scrutiny of counsel's performance
must be highly deferential."  Id.  Furthermore, "because the
Strickland standard is a general standard, a state court has
even more latitude to reasonably determine that a defendant has
not satisfied that standard."  Knowles v. Mirzayance, 556 U.S.
111, 129 S. Ct. 1411, 1420 (2009) (citation omitted).

        Finally, a petitioner raising an ineffectiveness claim
must do more than demonstrate that his attorney has not provided
appropriate assistance.  Even if a petitioner meets that burden,
he is entitled to relief only if he has been prejudiced by
counsel's failings - that is, only if there is a reasonable
probability that, on account of counsel's inadequacies, the
verdict was less favorable to the defendant than it would
otherwise have been.  Id. at 694-96.

        For Petitioner to obtain relief, he must demonstrate
that the Appellate Division unreasonably applied the principles
of Strickland to the facts of his case.  Williams v. Taylor, 529
U.S. 362, 413 (2000).  An unreasonable application is more than

11

just an incorrect application of law.  See Schiro v. Landrigan,
550 U.S. 465, 473 (2007) (noting that "[t]he question under
AEDPA is not whether a federal court believes the state court's
determination was incorrect but whether that determination was
unreasonable – a substantially higher threshold").  Accordingly,
a federal court may not grant relief "simply because that court
concludes in its independent judgment that the relevant state-
court decision, applied clearly established federal law
erroneously or incorrectly."  Williams, 529 U.S. at 411.
Rather, the state court's application must have been
"objectively unreasonable."  Id. at 409; Lockyer v. Andrade, 538
U.S. 63, 74 (2003).  If the state court's decision cannot be
viewed as objectively unreasonable, habeas relief is foreclosed,
regardless of how this court would resolve the issue in the
first instance.  See Brown v. Payton, 544 U.S. 133, 147 (2005);
Jimenez v. Walker, 458 F.3d 130, 148 (2d Cir. 2006), cert.
denied sub nom Jimenez v. Graham, 549 U.S. 1133 (2007).


**The Trial Proceedings**


        During its main charge, the trial court repeatedly
indicated that the State's obligation was to prove the elements

12

of the crime beyond a reasonable doubt.  Included in that
instruction was the following language:

> The phrase reasonable doubt is the standard American
> Criminal law burden of proof.
>
> A reasonable doubt means a doubt that is based upon
> reason.  It is a doubt of the head not of the heart.
> It is a doubt which remains after discussing the case
> in the jury room.
>
> It must, however, be a doubt based upon the evidence
> or the lack of evidence in this case.  In other words,
> it is not a theoretical exercise relating to that
> which you are exposed to in this trial.
>
> A reasonable doubt also means an actual doubt, a doubt
> you are conscious of having, after reviewing in your
> mind all of the evidence and after giving careful
> consideration to all of it.  If at that time you feel
> uncertain or are not fully convinced that the
> defendant is guilty and if you believe a reasonable
> person hearing the same evidence would not convict,
> then that is a reasonable doubt and the defendant
> would be entitled to a verdict of not guilty
> accordingly.
>
> On the other hand, this does not mean that a
> reasonable doubt may be based upon a feeling, a whim,
> a guess, surmise, or speculation or conjecture, nor
> may it be a kind of shield behind which a juror may
> seek to hide in order to avoid doing a painful or
> disagreeable duty.
>
> Also, there is no obligation on the part of the People
> to establish the elements of the crime beyond all
> doubt, for that would be virtually impossible given
> all the factors that relate to testimony of human
> beings.  However, the People's obligation is to prove
> the defendant's guilt beyond a reasonable doubt.

(Tr. 1263-1265.)

The trial court also gave the two-inference charge —
that Petitioner was entitled to every factual inference in his
favor which could reasonably be drawn from the evidence, and
that where two factual inferences might be drawn, both being of
equal weight and strength, one consistent with guilt, and one
consistent with innocence, then Petitioner would be entitled to
the inference consistent with innocence.  (Tr. 1257-1258.)
Moreover, the judge advised the jurors that an "inference" is a
"logical conclusion" that "naturally flows from some fact" that
the jury finds exists, and that Petitioner was entitled to
"every factual inference in his favor" that can "reasonably" be
drawn from the evidence.  (Tr. 1258.)  Further, the trial court
charged that Petitioner was presumed innocent, and that this
presumption remained with him throughout the trial until such
time as the jurors were convinced that his guilt had been proved
beyond a reasonable doubt.  (Tr. 1263.)  Finally, in advising
the jurors on how to reach a unanimous verdict, the judge gave
the following instruction:

> The two most important things that people do civically
> as opposed to military service are voting and jury
> service.  In voting, close counts.  50.1 beats 49.9
> every time.  And you're stuck with the person for two,

14

four, six or in the case of some judicial elections,
14 long years.

The same pool of people who can't figure out
collectively who to vote for, are all over the lot
about who to vote for and what to order for lunch, for
225 or 228 years have been unanimously deciding cases.
So how does that happen?

It happens because in the jury room, people change
their minds.  And you've heard me harp on the fact
that there is a law that covers everything.  Yes,
there is a law that covers when you can change your
mind.

You are allowed to change your mind from a position
that you may have originally held, a position you may
originally have voiced, a position you may originally
have ardently defended.

You can change that position if somebody by virtue of
reason and logic and reliance on the record [in] this
case can cause you to change your mind.  You can't
change your mind for a reason that would embarrass
you.  You have had enough.  You want to go home.  You
don't like what somebody else said.  You signed on to
be a juror.  You've done it.  Now let's go.  Anything
you would be embarrassed about is not a reason to
change your vote.


(Tr. 1280-1281).


        During deliberations, the jurors requested

"instructions relating to inference and intent."  Although

defense counsel requested that when the court gave the two-

inference charge, it use the word "non-guilt" instead of

"innocence," the court refused to alter the language of the

charge that it had previously given.  During its supplemental charge, the trial court restated that a defendant is entitled to "every factual inference in his favor" which can "reasonably be drawn from the evidence."  With respect to the juror's evaluation of "fact issues," the judge advised that where two factual inferences could be drawn, of "equal weight and strength," and one is consistent with guilt while the other is consistent with innocence, a defendant would be entitled to the "factual inference of innocence."  After instructing the jurors that they were entitled to draw "reasonable, logical, proper, just inferences" from facts they had already found, the court also advised that they were not allowed to "speculate" or "jump beyond" the "logical extension" and "conclusion" of the facts they had found.  Subsequently, the jury sent out a note requesting, inter alia, that the court repeat the definition of reasonable doubt and "repeat and, if possible, elaborate upon, the explanation of inferences from the facts and how to weigh inferences in favor of defendant vs. inference against the defendant; and, if possible, explain the relationship between 'reasonable doubt' and weighing inferences."

With respect to the jurors' request concerning "inferences," the prosecutor asked the court to reiterate what

16

it had said earlier during its supplemental charge. Defense
counsel requested that if the Judge recharged the jurors on
those "specific elements" or those "particular issues," he
"recharge them as [the judge] did before. (Tr. 1306.) As to
the court's plan to recharge the jurors regarding the two-
inference charge, defense counsel asked that the court not "go
into" the facts "at all," and emphasized that he wanted the
court to advise the jurors that, if two inferences could be
drawn from the facts, they must choose the inference favorable
to Petitioner. (Tr. 1307.) Counsel also again requested that
the court use the word "non-guilt" instead of innocence. (Tr.
1307.) Counsel indicated that he had a "problem" with the
jurors' last question regarding reasonable doubt as it related
to inferences. (Tr. 1308.) The court stated that "as long as I
make it clear that the burdens of proof are worlds apart when
inference are being discussed and when reasonable doubt is being
discussed that there is no error." (Tr. 1308.)

        In response to the note, Justice McLaughlin advised
the jurors that proof beyond a reasonable doubt was used to tell
the jurors "how strong" the evidence of guilt "must be" to
permit a guilty verdict, and that it was insufficient to prove

that a defendant in a criminal case was "probably guilt." (Tr. 1310-1311.) The court also advised the jurors that:

> Proof of guilt beyond a reasonable doubt is proof that leaves you so firmly convinced of the defendant's guilt that you have no reasonable doubt of the existence of any element of the crime, or of the defendant's identity as the person who committed the crime.
>
> A reasonable doubt is an honest doubt of the defendant's guilt for which a reason exists based upon the nature and quality of the evidence. The doubt can arise from the evidence that was presented or from the lack of evidence that was presented or from the lack of material and convincing evidence.
>
> A reasonable doubt is not a fanciful or imaginary doubt. It is a doubt that a reasonable person, acting in a matter of this importance, would be likely to entertain because of the evidence or because of the lack of material and convincing evidence.

(Tr. 1311-1312.)


The judge then informed the jurors of the following: that fact-finding was based on inferences, that his instructions were not an effort to lead them to any particular conclusion; that inferences and facts were established when a jury determines that a fact can be established by "direct proof" or by their "process of evaluation" based on a "logical inference" from another fact that they had decided, and that the jurors could "make factual decisions" by "crediting testimony" about an

18

event or by concluding, based on an inference, that a fact

existed.  (Tr. 1312-1313.)  The judge illustrated his point with

an analogy:  the jurors could credit a witness who saw a man

jump in the lake, or could decide that a man had jumped in the

lake if a witness saw him dripping wet near the lake on a sunny

day.  (Tr. 1313-1314.)  The court then gave the jurors the

following instructions regarding the finding of facts:

> For a fact to exist, whether by your crediting a
> testimonial witness or concluding based on an
> inference for a fact to exist, the burden of proof,
> the standard of proof is 50.1, more likely than not.
> That is a hugely different situation from beyond a
> reasonable doubt, which is focused on the elements as
> you consider the elements and the ultimate decision
> whether to convict of a charge.
>
> In a trial, as I said yesterday, some factual issues
> go completely unresolved.  They are just in the nice
> to know category.  Wouldn't that be nice if we knew
> this.  Some things you need to resolve in order to
> have a sufficient basis to say it's proven or not
> proven.  But to resolve a factual issue the burden is
> more likely than not 50.1.
>
> To resolve a case the element of an individual charge
> and the ultimate decision beyond a reasonable doubt
> (sic) which is the standard that I described now two
> different ways.
>
> For now, that's the best that I can do.

(Tr. 1314-1315).

19

Thereafter, defense counsel objected, stating that the supplemental charge failed to address the jurors' request that the court "elaborate upon the explanation of inferences from the facts and how to weigh inferences in favor of defendant versus inferences against the defendant." Counsel proposed that the court advise the jurors that if they could draw only two inferences from a particular fact, "one in favor of the defendant, one against the defendant" or "one supporting guilt and one supporting nonguilt," that the jurors must draw the inference in favor of Petitioner. (Tr. 1315-1316.) The court replied that defense counsel's proposed charge did not answer the jury's question and noted that the jurors wanted instruction on the difference between the standards they had to use to find reasonable doubt as opposed to factual inferences. (Tr. 1316) The judge also asserted that:

> I think that question wants in some fashion to go
> through an analysis of some hypothetical fact like
> this trial and tell them what I think are the factual
> things that might be in defendant's favor and what
> factual things might be in the jury's [sic] favor.
> And then try to give them assistance in how to resolve
> those. Which I'm satisfied I can't possibly do even
> if I was smart enough to do it.

(Tr. 1316).

20

## The Appellate And Post-Conviction Proceedings

On his first direct appeal, Petitioner complained that the trial court's supplemental instruction regarding the fact-finding preponderance language was improper.  The Appellate Division found that Petitioner's claim in this regard was unpreserved, declined to review the claim in the interest of justice, and noted that if the court were to review Petitioner's complaint, it would have rejected it on substantive grounds as well.  Subsequently, the New York Court of Appeals also found that Petitioner's complaint about the fact-finding preponderance language in the supplemental charge was unpreserved, and thus it lacked authority to rule on the merits of the claim.

Petitioner then mounted an indirect attack on the trial court's charge by filing his second post-conviction motion asserting that his trial counsel was ineffective.  In support of his claim, Petitioner asserted that his trial counsel had improperly failed to object to the supplemental instruction that the Petitioner had previously challenged on direct appeal.  In addition, Petitioner faulted his attorney for failing to object to the two-inference language in both the main and supplemental instructions.  Indeed, Petitioner claimed that his lawyer had

21

improperly "solicited" that charge to be given to the
deliberating jurors in response to a note.  Finally, Petitioner
asserted that when these purportedly erroneous charges were
coupled with the election language that the court gave during
the main charge — "in voting, close counts, 50.1 beats 49.9
every time" – it resulted in an overall instruction that lowered
the burden of proof an "unconstitutional extent."  According to
Petitioner's motion, the court's two-inference charge was
erroneous because it was confusing and burden-reducing.
Petitioner also asserted that when this charge was viewed in the
context of the fact-finding preponderance instruction that had
also been given, the overall effect was to undermine the jurors'
understanding of the presumption of innocence and the
requirement that the State was compelled to prove the elements
of the crime charged beyond a reasonable doubt.

        In further support of his claim that his counsel was
ineffective, Petitioner pointed to an affidavit from trial
counsel that accompanied the motion.  In that affidavit, trial
counsel stated that he had not objected to the two-inference
language in the main or supplemental charges because he believed
that such an instruction "benefitted [petitioner] because it
allowed the jury to draw inferences in his favor."  According to

22

trial counsel, he had neither focused on "the burden-reducing" aspect of the charge, nor did he consider how the state trial court's fact-finding preponderance charge might work, in combination with the two-inference charge and the election language, to "dilute" the reasonable doubt standard.

In a decision dated March 3, 2008, Justice McLaughlin denied Petitioner's motion. He found, inter alia, that, in the light of the relevant case law that existed at the time of Petitioner's trial, trial counsel's failure to object to the two-inference instruction, either in the main charge or the supplemental instruction, did not render his representation constitutionally deficient. He also found that although counsel "arguably" should have objected to that "erroneous" instruction, the charge as a whole correctly explained the proper burden of proof. Moreover, the judge pointed out that during the main charge, he had advised the jurors that the State bore the burden of proof, extensively explained the concept of reasonable doubt, and repeatedly stated that the State was required to prove the elements of the crime beyond a reasonable doubt. Thus, he found that when viewed in the overall context of Petitioner's trial, the two-inference instruction was not defective (App. to Pet. A198-A199).

23

Nor did the fact-finding preponderance charge operate
to dilute the State's burden, according to Justice McLaughlin.
The judge pointed out that he had "clarified" that the
"reasonable doubt standard applied to the elements and to the
verdict," and that "the reasonable doubt standard was the higher
standard of proof."  Moreover, the supplemental charge ended
with the instruction that the level of proof required to find an
element and to reach a guilty verdict was beyond a reasonable
doubt.  Thus, according to the court, the jurors could not have
failed to understand the proper standards to apply. (App. to
Pet. A201-A202).

According to Justice McLaughlin, for that reason, the
charges he gave the jury at Petitioner's trial differed from the
instructions that had caused the Appellate Division to reverse
the defendant's conviction in People v. Johnson, 11 A.D.3d 224
(N.Y. App. Div. 2004).  Justice McLaughlin pointed out that the
charge here emphasized that the "more likely that not" standard
for finding facts was "a hugely different situation from beyond
a reasonable doubt, which is focused on the elements . . . and
the ultimate decision whether to convict of a charge." (App. to
Pet. A201-A202.)  Additionally, unlike in Johnson, "the court

24

did not dilute the burden of proof by referring to the numerical

formulation for the preponderance of the evidence standard in

the unanimous jury instruction."  (App. to Pet. A202)  Thus, he

found that, taken as a whole, the charge was not defective and

the Petitioner suffered no prejudice by virtue of his attorney's

failure to object to the jury instructions at issue. (Id.)


The Appellate Division unanimously affirmed the trial

court's decision.  According to that court, the issue at hand

was not the propriety of the challenged instructions, but

whether counsel's failure to object to the charge and his

"specific requests" for one of those instructions, rendered his

representation constitutionally deficient.  According to the

Appellate Division, it did not.  People v. Miller, 64 A.D.3d 471

(N.Y. App. Div. 2009).


The Appellate Division found that, although there were

"several aspects" of the trial court's main and supplemental

charges that were similar to the language the Appellate Division

had cited when it reversed the defendant's conviction in

Johnson, 11 A.D.3d 224, there were important distinctions.

Specifically, in petitioner's case, the trial judge had

"highlighted" the difference between facts and elements," and

25

"expressly" told the jurors that the "reasonable doubt standard" was the "only standard" that "applied to the elements of the crimes charged." People v. Miller, 64 A.D.3d at 471.  In that context, the Appellate Division found that the presence of language in the charge that it had previously found improper "did not misstate the constitutionally required standard of proof or compromise defendant's right to a fair trial."  Id.

Petitioner then filed an application for leave to appeal the Appellate Division's decision.  In a decision dated September 28, 2009, the Court of Appeals denied that application.  People v. Miller, 916 N.E.2d 442 (N.Y. 2009).

**The State Court Determination Was Not An Unreasonable Application Of Supreme Court Precedent**

Here, the state court acted reasonably when it concluded that, under the above-described standard, Petitioner had not met his burden of demonstrating his trial counsel's ineffective assistance.

First, on Petitioner's first direct appeal, the Appellate Division and the New York Court of Appeals found that

26

Petitioner's complaint about the fact-finding preponderance
language in the supplemental instruction was unpreserved for
review.  Nevertheless, the Appellate Division stated that if it
were to review the claim, the court "would reject" it.  People
v. Miller, 8 A.D.3d 176, 178 (N.Y. App. Div. 2004).

When Petitioner then filed a post-verdict motion
requesting that the judgment against him be reversed, on
essentially the same grounds that he now raises, Justice
McLaughlin explicitly rejected the claim that trial counsel's
failure to object to certain portions of the court's charge had
rendered his otherwise effective representation deficient.  The
Appellate Division then affirmed that decision.  People v.
Miller, 64 A.D.3d 471 (N.Y. App. Div. 2009).

The effectiveness of Petitioner's representation must
be evaluated in the context of the kind of evidence presented
against Petitioner.  As discussed in Point I in Respondent's
Brief in the Appellate Division, Lakisha Ridley, the eyewitness
to the murder, described how her friend Mark Pressley was robbed
at gunpoint of money and jewelry and then killed by the robber.
A defense based on a lack of intent was undermined by the robber
having put his gun to the victim's neck and threatening to kill

27

him if he did not hand over his property.  A misidentification

defense was undermined by the testimony of Anthony Hicks, who

had known Petitioner for years, and who saw him flee in the

alleyway between 154th and 155th Streets, exactly where Ridley

described the shooter as having run after the murder.  In

Ridley's identification testimony, she stated that she noticed

Petitioner just before the crime and observed him from only

several feet away shoot and kill the victim.  Ridley identified

Petitioner as the murderer in a lineup conducted only four days

after the incident.  The combination of Ridley's and Hicks'

testimony rendered this a case in which a misidentification

defense had little chance of success.  However, trial counsel

made zealous efforts on Petitioner's behalf, notwithstanding the

limitations imposed by the nature of the evidence itself.

Nor was Petitioner's representation rendered deficient

because trial counsel failed to object to the portions of the

charge now cited by Petitioner.  Although appellate courts have

criticized the two-inference and fact-finding preponderance

instructions, neither of the challenged charges has actually

been held to be incorrect.  For example, in Johnson, 11 A.D.3d

224, decided over four years after Petitioner's trial, the

Appellate Division disapproved of the two-inference charge as

confusing and as implying that a preponderance standard was relevant to the State's burden of proof.  The Appellate Division also faulted the instruction because it did "not go far enough" regarding what jurors should do when the inference of guilt is stronger than the inference of innocence but not strong enough to be beyond a reasonable doubt.  However, the Appellate Division recognized that the two-inference language had previously been described as "'formally correct,'" Id. at 225 (quoting People v. Fox, 72 A.D.2d 146, 147 (N.Y. App. Div. 1980)), and as "'obviously correct as far as it goes.'" Johnson, 11 A.D.3d at 225 (quoting United States v. Khan, 821 F.2d 90, 93 (2d Cir. 1987)).

The Second Circuit has stated that "trial judges should not include any variation of the 'two-inference' language in their charge" because "such an instruction by implication suggests that a preponderance of the evidence standard is relevant, when it is not." Kahn, 821 F.2d at 93.  However, in this case the trial court made clear that the fact-finding preponderance language was not pertinent to any of the elements of the charged crimes, but related only to the jury's findings of facts based on inferences by a preponderance.  Thus, although appellate courts have complained that these charges are

29

confusing, especially under circumstances where the reasonable doubt instruction is unclear, these instructions, in and of themselves, have not been found to be improper. See United States v. Delibac, 925 F.2d 610, 614 (2d Cir. 1991) (instruction that the jury need not find every fact beyond a reasonable doubt is "probably confusing" if correct statement of the law); see also, United States v. Gatzonis, 805 F.2d 72, 74 (2d Cir. 1986) (upholding charge, when viewed in context of charge as a whole, that to support a guilty verdict, that each item of evidence need not be proven beyond a reasonable doubt), cert. denied, 484 U.S. 932 (1987); United States v. Viafara-Rodriguez, 729 F.2d 912, 914 (2d Cir. 1984) (same).

        Indeed, as trial counsel noted in its affidavit, in certain respects, the contested instructions benefit a defendant.  The initial language of the two-inference charge, that a defendant is entitled to every factual inference in his favor which can reasonably be drawn from the evidence, is certainly favorable to the defense.  When the court indicated that the burden of proof of deciding facts based on inferences from other facts was "50.1, more likely than not," it essentially advised the jurors that every fact that they accepted had to be proved by a preponderance of the evidence.

It was reasonable for trial counsel to believe not only that the fact-finding preponderance instruction failed to harm his client, but that it actually worked in his favor.

Petitioner now argues that the challenged instructions, combined with the "election" language, created a risk that the jurors applied an inappropriate standard of proof when determining Petitioner's guilt of the charged crimes. However, counsel had no reason to object to the "election" language at the end of the main charge, either if considered by itself or combined with the other contested instructions.  In discussing the deliberation process, the trial court advised the jurors that voting in an election and jury service are important civic functions, but that "in voting, close counts.  50.1 beats 49.9 every time."  The judge continued that "you're stuck with the person for the term to which they have been elected." However, he cautioned the jurors that during deliberations, and before the final verdict, they could change their minds from a position that they originally held based on "virtue of reason and logic" and "reliance on other record."

This portion of the charge did not deal with the burden of proof but rather aspects of the deliberation process.

31

Although the election language repeated the "50.1 to 49.9" reference of the fact-finding preponderance instruction, it made no reference to the State's burden of proof.  The court then used that example as a foil to explain how the jury should deliberate reach a unanimous verdict.  See, Brown v. Greene, 577 F.3d 107, 113 (2d Cir. 2009) (obvious that "election language" had nothing to do with burden of proof), cert. denied sub nom Brown v. Rock, 130 S.Ct. 1881 (2010).

The propriety of these charges has further been recognized by this court in Jones v. Poole, No. 07 Civ. 6587, 2009 WL 2633669 (S.D.N.Y. Aug. 26, 2009).  In that case, although the petitioner criticized the same trial judge for having given instructions that were virtually identical to the ones under consideration here, including the two-inference charge, the fact-finding preponderance charge, and the election language, Chief Judge Preska rejected the petitioner's request for a writ of habeas corpus.  Relying on the Second Circuit's decisions in Delibac, 925 F.2d at 614, Khan, 821 F.2d at 92, Gatzonis, 805 F.2d 72, and Viafara-Rodriguez, 729 F.2d at 913, Chief Judge Preska noted that not Supreme Court decision has considered the two inferences charge, and that the Circuit "certainly does not consider the two-inferences charges and

32

preponderance of the evidence factfinding to be
unconstitutional." Jones, 2009 WL 2633669, at *13 & n.5
(citations omitted).  As to both issues, Chief Judge Preska
found that there was "no clearly established due process rule,
as determined by the Supreme Court, [that] proscribes such
references in jury charges." Id. at *12.


      In reviewing the adequacy of a trial court's
instructions, challenged portions of the charge are not to be
examined in a vacuum, but rather, are to be assessed in the
context of the instructions in their entirety to see whether the
jury would have understood the correct rule of law to be
applied.  See Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)
(citing Boyd v. United States, 271 U.S. 104, 107 (1926)).  More
specifically, as the Second Circuit noted in Brown v. Greene,
due process is violated if the challenged instruction creates a
reasonable likelihood that the jury understood it to allow
conviction based on evidence insufficient to meet the proof
beyond a reasonable doubt standard.  Brown v. Greene, 577 F.3d
at 111.  In making the assessment of whether the jury understood
the correct standard for conviction, "the challenged
instructions must be viewed in context, not only with respect to

33

the overall charge, but also with respect to the entire trial record." Id. at 110-111 (citations omitted).

The Second Circuit applied that principle in Brown v. Greene, where the petitioner criticized instructions very similar to the fact-finding preponderance and election language at issue here. The Appellate Division had rejected Brown's ineffective assistance of counsel claim, and the Second Circuit found that that decision "was not contrary to, or an unreasonable application of, federal law." Brown v. Greene, 577 F.3d at 114. In reaching that conclusion, the Second Circuit relied on its prior rulings in Gatzonis, Delibac, and Viafara-Rodriguez, where the court upheld instructions very similar to the ones at issue, especially since in each case the jury instructions as a whole impressed upon the panel that the elements of the charged crime had to be proved beyond a reasonable doubt. See id. Petitioner attempts to distinguish Brown v. Greene on the ground that the charge there did not contain the two-inference charge (Pet. 34), and speculates that the Second Circuit would have faulted the Appellate Division if the charge in Brown v. Greene contained the two-inference language. However, the gravamen of the decision in Brown v. Greene was the determination the charge as a whole must properly

34

convey the reasonable doubt standard, even if some of the
language of the charge was somewhat confusing.

In Jones, which involved the same trial judge and
virtually identical instructions as here, Chief Judge Preska
found that, particularly since the trial court's instructions
had repeatedly emphasized that the State must prove all the
elements of the charges beyond a reasonable doubt, the state
court acted reasonably when it had affirmed the
constitutionality of the jury instructions at issue.  Jones,
2009 WL 2633669 at *12-13.  See also Justice v. Hoke, 45 F.3d
33, 35 (2d Cir. 1995) (finding that language suggesting separate
burden of proof for subsidiary facts was constitutionally
permissible when viewed in context of entire jury charge).

Here, risk of confusion was mitigated by numerous
references to the fact that the elements of the crime had to be
proved beyond a reasonable doubt through the main charge and the
rest of the trial.  For example, during the main charge, the
judge instructed the jurors that in order to convict the
Petitioner, they must be convinced beyond a reasonable doubt of
this guilt of the charged crimes. (Tr. 1263.)  The trial court
repeatedly emphasized that the State was obligated to prove each

35

element of the charged crimes beyond a reasonable doubt (Tr.
1265-1267, 1270), as well as that if the panel found any single
element unproved, they had no choice but to acquit.  (Tr. 1270,
1277.)  Furthermore, the judge instructed the jury that the
State was not only required to prove the elements of the crime
beyond a reasonable doubt, but also to prove, by that standard,
that it was the Petitioner who committed the crime.  (Tr. 1266-
1269.)

     However, the instructions provided in the court's main
charge, whether correct or not, do not end the charge-as-a-whole
analysis here, because the jury pressed follow-up questions
specifically directed to the burden of proof.  As the Second
Circuit observed in Arroyo v. Jones, 685 F.2d 35, 40 (2d Cir.
1982), where the State urged that the court's correct initial
instructions on intent cured a later improper Sandstrom charge,
"the initial instructions cannot be deemed to have disinfected
the later presumption language because the jury's questions
reveal that the initial charge simply was not understood. . .
.[I]t would be decidedly dense of us to assume that the
unobjectionable initial charge, as to which enlightenment was
requested, itself enlightened the jury as to the real meaning of
the improper enlightenment."  Id.  Thus, the main charge

36

standing alone cannot be taken to have cured later errors in the supplemental charge.

In Arroyo, the State argued that the presumption language, read in light of the charge as a whole, did not have the effect of shifting the burden on intent to the defendant or depriving him of the presumption of innocence.  The Second Circuit rejected that argument, focusing on the instruction's presence in a supplemental charge:

> In light of the special prominence of the presumption language by reason of its presence in a supplemental instruction, see Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946), and the series of questions from the jury that preceded it, we cannot conclude that the offending language was 'harmless beyond a reasonable doubt' (citation omitted).

Id. at 39.  The court continued:

> A supplemental charge must be viewed in a special light.  It will enjoy special prominence in the minds of the jurors for several reasons.  First, it will have been the most recent, or among the most recent bit of instruction they will have heard, and will thus be freshest in their minds.  Moreover, it will have been isolated from the other instructions they have heard, thus bringing it into the foreground of their thoughts. . . .And most importantly, the supplemental charge will normally be accorded special emphasis by the jury because it will generally have been given in response to a question from the jury.

Id.


Here, in response to the jury's request, the court reiterated the reasonable doubt standard throughout the supplemental charges.  (See Tr. 1298-1299, 1302-1303, 1310-1311, 1314.)  These included repeated statements that each element of the crime must be proven beyond a reasonable doubt, and, a variant of the point made in the main charge, that "[i]f any one or more is not proven, you must acquit.  You have no choice." (Tr. 1299.)  Indeed, the final supplemental charge several times repeated that reasonable doubt was the standard necessary to prove a defendant guilty.  (Tr. 1310-1312, 1314.)  This charge included that statement that the fact-finding standard was "a hugely different situation from beyond a reasonable doubt, which is focused on the elements as you concise the elements and the ultimate decision whether to convince of a charge."  (Tr. 1314.)


Although Petitioner suggests that the fact-finding charge lowered the standard of proof because jurors might combine the pieces articulating a lower standard such that we

38

cannot be certain that the jury found him guilty beyond a
reasonable doubt, the court reminded the jurors in its final
charge that the focus of the trial was to see if the State could
prove the elements of the charged crimes beyond a reasonable
doubt and that proof beyond a reasonable doubt was used to
determine "how strong" the evidence of guilt "must be" to permit
a guilty verdict and that it was insufficient to prove only that
a defendant was "probably guilty." (Tr. 1310.)  The trial court
again defined reasonable doubt, stating that proof beyond a
reasonable doubt was proof that "leaves [one] so firmly
convinced" of the Petitioner's guilt that one has "no reasonable
doubt" of the existence of any element of the crime or the
Petitioner's identity as the person who committed the crime.
(Tr. 1311.)


        The Appellate Division found that the trial court's
charge, viewed as a whole, clearly and unequivocally advised the
jury of the proper standard for conviction.  The state court
relied on its assessment that the trial court in its later
elaboration "highlighted the difference between facts and
elements, and expressly told the jury that the reasonable doubt
standard was the only standard that applied to the elements of
the crimes charged."  64 A.D.3d at 471.  Contrary to

Petitioner's contention, the Appellate Division's decision in
Johnson, 11 A.D.3d 224, does not indicate otherwise.  Petitioner
claims that in this case, the jury heard the same instructions
that led the Appellate Division to reverse the defendant's
conviction in Johnson.  However, as the Appellate Division
pointed out in its opinion, 64 A.D.3d at 471, the charge in
Johnson was not identical to the instructions at issue here.  In
Johnson, the trial court had instructed the jury:

> Every defendant is entitled to every factual inference
> in his favor which can reasonably be drawn from the
> evidence.  And where two factual inferences can be
> drawn from the evidence, both being of equal weight
> and strength, one factual inference consistent with
> guilt, and the other factual inference consistent with
> innocence, any defendant is entitled to the factual
> inference of innocence.
>
> With regard to facts and with regard to the verdict,
> there are two different burdens of proof operating
> simultaneously.  With regard to finding of fact during
> the course of your deliberations, the burden of proof
> is simply that it is more likely than not that the
> fact exists, 50.1 beating 49.9.

Johnson, 11 A.D.3d at 226-27.


        Three portions of the charge in Johnson were of
primary concern to the court:  (1) the "two inference" charge;
(2) the language indicating that there are "two different

burdens of proof operating simultaneously"; and (3) the concept
that the burden of proof for findings of fact was simply "more
likely than not that the fact exists."  The Appellate Division
found that the instructions given by the trial judge were not
"merely potentially confusing," but could have "undermin[ed] the
jury's understanding of the presumption of innocence, the burden
of proof and the standard of proof beyond a reasonable doubt."
Id. at 226.

As noted above, the Appellate Division found that the
charges given by the judge here were distinguishable.  Although
as in Johnson, Justice McLaughlin charged the two-inference and
the fact-finding preponderance language, he did not mention the
concept of "two burdens of proof operating simultaneously"
regarding the preponderance language.  Notably, too, unlike in
Johnson, the trial court here used the fact-finding
preponderance language only in response to two notes from the
jurors specifically requesting instructions regarding inferences
and inferences from facts.  Thus, as the state court found, in
contrast to the instructions given in Johnson, the charges given
during Petitioner's trial could not have undermined the trial
court's correct and repeated instructions on the presumption of
innocence and the People's burden of proof.  Indeed, since the

charges as a whole, and in context, conveyed the proper standard
to the jury, the failure of Petitioner's counsel to object to
those charges could cause no prejudice.  See Brown v. Greene,
577 F.3d at 119.

Here, the issue is whether, given the case law when
Petitioner was tried in January of 2001, his attorney could have
reasonably been expected to complain about the instructions now
challenged.  See Id. at 112.

Notably, at the time of Petitioner's trial, neither
the two-inference nor the fact-finding preponderance instruction
had been criticized as impermissibly diluting the proof standard
when viewed either together or when combined with the election
language.  There were a number of state cases that voiced
disapproval of the two-inference charge.  See People v. Durden,
211 A.D.2d 568, 569 (N.Y. App. Div. 1995) (referring to two-
inference language as "disfavored"); People v. Kwung, 186 A.D.2d
365, 365 (N.Y. App. Div. 1992) (challenge to two-inference
charge unpreserved; in any event, reversal not warranted where
charge as a whole conveyed proper proof standard); People v.
Cruz, 172 A.D.2d 383, 383 (N.Y. App. Div. 1991) (while such two-
inference instructions have been criticized as potentially

42

confusing to the jury, reversal not warranted where the charge
as a whole conveyed the appropriate proof burden); see also Fox,
72 A.D.2d at 147  (undesirable to refer to "your minds are
wavering . . . the scales are even" even as alternative which
result in acquittal, but statement is formally correct).


There were also a number of federal cases, which were
not binding on Petitioner's state court trial, that voiced
similar concerns.  See United States v. Muvet, 225 F.3d 647
(Table), at *1 (2d Cir. 2000) (criticizing the "two-inference"
charge but upholding it on appeal, especially given entire
reasonable doubt standard conveyed to jury since charge as whole
adequately conveyed definition of reasonable doubt), cert.
denied sub nom Sosa v. United States, 531 U.S. 1166 (2001);
Navarez v. United States, 532 U.S. 913 (2001), Muyet v. United
States, 535 U.S. 1086 (2001); United States v. Inserra, 34 F.3d
83, 91 (2d Cir. 1994) (same); United States v. Attanasio, 870
F.2d 809, 818 (2d Cir. 19089) (same); Khan, 821 F.2d at 92-93
(same).  However, in neither any state nor federal decision did
the appellate court actually reverse the defendant's conviction.


Petitioner has contended that, in fact, in several
decisions issued by the Second Circuit, the court found the use

43

of similar charges to be unconstitutional.  However, in each of
those cases, the reversal either did not rest exclusively on
charges as found here or, unlike here, the reasonable doubt
charge was not considered thorough enough to have compensated
for any confusion created by the jury instructions at issue.
Thus, in Bloomer v. United States, 162 F.3d 187 (2d Cir. 1998),
and United States v. Birbal, 62 F.3d 456 (2d Cir. 1995), the
contested charges also included language indicating that the
jury need not find every fact beyond a reasonable doubt to
support a guilty verdict.  However, reversal was mandated
because the challenged charges also equated reasonable doubt
with a "substantial doubt," and advised the jury only that it
"may" acquit if the prosecution failed to prove his guilt beyond
a reasonable doubt.  Similarly, in Gaines v. Kelly, 202 F.3d
598, 608-11 (2d Cir. 2000), the instructions given by the trial
court improperly defined reasonable doubt three times, non
similar to the charges here, the cumulative effect of which was
found to produce a reasonable likelihood that the jury applied
the instruction in an unconstitutional manner.

        The two-inference charge given by the trial court in
People v. Allen, 192 A.D.2d 433, 435 (N.Y. App. Div. 1993) was
unlike the instruction given during Petitioner's trial, as it

made reference to "equal inferences" in a manner permitting the
jury to conclude that, if the inferences were <u>not</u> equal, there
was sufficient evidence to convict and instructed the jury that
"if you have a doubt" but "cannot express" either the doubt or a
reason therefore, "then the prosecutor has proven her case."
Moreover, the defendant's conviction was reversed because of
various charge errors not present here, including the submitting
of improper charges concerning reasonable doubt and the
defendant's failure to testify.  Likewise, in <u>People v. Stinson</u>,
186 A.D.2d 23 (N.Y. App. Div. 1992), the defendant's conviction
was reversed because the trial judge gave an improper charge
with respect to the defendant's failure to testify, erroneously
advised the jury about the presumption of innocence, and
employed garbled language during a two-inference instruction
that indicated that if a "track" was "not equal," defendant was
"not necessarily entitled" to an inference of non-guilt.

        As to the fact-finding preponderance instruction here,
at the time of Petitioner's trial, there were a few federal
cases, which were not binding precedent with respect to
Petitioner's state court trial, that questioned the propriety of
instructions similar to the language at issue here.  <u>Delibac</u>,
925 F.2d at 614 (fact-finding preponderance instruction is

correct statement of law but "probably confusing" and "certainly unnecessary"); see also Birbal, 62 F.3d at 460 (same); Gatzonis, 805 F.2d at 74 (when viewing charge as a whole, upholding charge that to support guilty verdict, jury need not find every bit of evidence beyond a reasonable doubt, but only that evidence established beyond a reasonable doubt each element of charged crime); Viafara-Rodriguez, 729 F.2d at 914 (same).  However, in Brown v. Greene, the Second Circuit found that none of these precedents were sufficient to alert Petitioner's counsel to raise objections at his trial.  Indeed, noting that the court need not rule on the propriety of the charges, the Second Circuit explicitly indicated that based on its precedents in Delibac, Gatzonis and Viafara-Rodriguez, and considering that Brown v. Greene was before the court on a habeas petition, defense counsel's "failure to object to the jury charge did not constitute ineffective assistance of counsel."  Brown v. Greene, 577 F.3d at 113.

There was no state case law condemning the fact-finding preponderance language that would have put counsel on notice that that language might be viewed as impermissibly diluting the standard of proof when viewed in tandem with the two-inference instruction.  Perhaps most significantly, Johnson,

the case on which Petitioner has placed the most reliance, was
not decided until four years after Petitioner's trial.  Brown v.
Greene, 577 F.3d at 113.  ("Johnson should not be used as a
basis to fault [the petitioner's] trial counsel, since it was
decided two years after [petitioner's] trial").  Thus, in early
2001, although a few state court decisions had criticized the
two-inference instruction and some federal appellate courts had
faulted the two-inference and fact-finding preponderance
instructions, counsel could not have anticipated that the
challenged charges would be subject to stricter scrutiny in the
future, and more roundly criticized by appellate courts.

When Petitioner first posed any challenge to the
court's instructions in his first post-conviction motion and his
first direct appeal, he complained only about the fact-finding
preponderance language.  At that time, he launched no attack
whatsoever on the two-inference or election charges, nor did he
argue that the combination of those charges undermined the
reasonable doubt standard, as he does now.  If it was not
obvious to appellate counsel in 2005 that this combination of
these charges was objectionable, it is difficult to conclude
that it should have been plain to trial counsel in 2001.

47

Petitioner has contended that the contested charges suggested that the jurors could find the element of intent by a preponderance of the evidence.  According to Petitioner, the "only evidence" of intent was the location of the gunshot wound, a witness' suggestion that the shooter became angry during the crime, and a sound bite on the victim's cellular telephone. Petitioner argues that the challenged instructions, taken together, made it likely that the jurors decided intent based only on preponderance of the evidence because the jurors had to draw an inference from "several highly disputed facts" in order to find that Petitioner intended to kill the victim rather than have shot him unintentionally during a struggle.  However, As detailed in the State's Brief in the Appellate Division, Lakisha Ridley's testimony supported that Petitioner approached the victim in the car, put a gun to his neck, and said "Give me everything you have.  Give me your drugs.  Give me your jewelry. I kill you, punk ass nigger.  You think I'm playing with you." (Tr. 172-181, 225-226 (Ridley Test.).)  After the victim turned over his ring, bracelet and a neck chain, he was shot.  (Id.)

Although Petitioner has also asserted that the combined charges suggested that the jurors could determine Petitioner's identity as the killer by a preponderance of the

48

evidence, there was evidence that Petitioner was the killer from
Anthony Hicks, who had known Petitioner all his life and who saw
him fleeing the murder scene (Tr. 37-47, 77-84 (Hicks Test.)),
as well as from the victim's friend, Ridley, who observed
Petitioner from only feet away during the murder and who
identified him as the shooter only four days later in a lineup
(Tr. 168-181, 216-226, 234, 814-817 (Hicks Test.)).  Given this
evidence as to intent and identification, Petitioner's
contention that the challenged charges caused him to be
convicted only by a preponderance of the evidence is
challengeable.  This is all the more the case as the trial court
emphasized throughout the supplemental charges that in order to
convict Petitioner, the State must prove the elements of the
charged crimes beyond a reasonable doubt, and extended that
directive to the Petitioner's identity as the person who killed
the victim.

49

**Conclusion**

   For the reasons set forth above, the petition for a writ of habeas corpus is denied.

   It is so ordered.

New York, NY
August 29, 2011

         ROBERT W. SWEET
           U.S.D.J.